Filed 10/29/13  Hull v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| TIMM DEE HULL,<br><br>        Petitioner,<br>v.<br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br>        Respondent;<br>THE PEOPLE,<br>        Real Party in Interest. | E057256<br><br>(Super.Ct.No. FELSS1103911)<br><br>OPINION |
| In re TIMM DEE HULL,<br><br>    on Habeas Corpus. | E057680 |
| GARRETT AMMON,<br>        Petitioner,<br>v.<br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br>        Respondent;<br>THE PEOPLE,<br>        Real Party in Interest. | E057257<br><br>(Super.Ct.No. FELSS1103527) |
| In re GARRETT AMMON,<br><br>    on Habeas Corpus. | E057681 |

1

ORIGINAL PROCEEDINGS; petitions for writ of mandate and petitions for writ of habeas corpus. Katrina West, Judge. Petitions for writ of mandate and petitions for writ of habeas corpus are denied.

Phyllis K. Morris, Public Defender, and Jeffrey Lowry, Deputy Public Defender, for Petitioners.

No appearance for Respondent.

Michael A. Ramos, District Attorney, and Grace B. Parsons, Deputy District Attorney, for Real Parties in Interest.

## INTRODUCTION

In these matters, the inmate petitioners were retained in custody past their scheduled release dates in order to enable the California Department of Mental Health (Department) to complete evaluations under the "Sexually Violent Predator Act" (SVPA). (Welf. & Inst. Code,[1] §§ 6600 et seq.) The question raised is whether such continued custody was "unlawful" within the meaning of section 6601, subdivision (a)(2), so that the trial court lacked jurisdiction to proceed with the SVPA cases. We conclude that petitioners were not lawfully in custody at the time the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

commitment petitions were filed, and that petitioners were entitled to have those petitions dismissed.[2]

STATEMENT OF FACTS

Because the relevant facts are not disputed, we can quickly sketch the factual framework on which we decide these cases. Both petitioner Timm Dee Hull and petitioner Garrett Ammon were incarcerated following convictions for offenses that qualified them for evaluation under the SVPA. (See § 6600, subd. (b), for the list of "sexually violent offenses.") Petitioner Hull was due to be released on July 23, 2011; petitioner Ammon on July 3, 2011. The People filed a petition to commit Hull as a sexually violent predator (SVP) on August 24; the Ammon petition was filed on August 4.

---

[2] Petitioners Hull and Ammon first filed petitions for writ of mandate. As they involved the identical legal issue on virtually identical facts, we issued an order to show cause and consolidated the petitions. After we had completed the tentative opinion, petitioners filed petitions for writ of habeas corpus, apparently for the purpose of placing new information and documentary evidence before this court. We also consolidated those proceedings with the pending cases.

In connection with the habeas corpus petitions, petitioners asked this court to take judicial notice of the mandate files and exhibits. The People have objected to exhibits 14 and 15, which were not submitted to the trial court. We see no reason why these exhibits—legislative history materials relating to amendments to the SVPA in 1996 and 2000—could not simply have been presented as exhibits to the habeas corpus petitions, which arise as original matters in this court. Hence, the request for judicial notice is granted. We do note, however, that our decision does not depend on these exhibits.

Because section 6601, subdivision (a)(2), generally requires that an inmate have been in lawful custody at the time the SVPA petition is filed,[3] petitioners filed motions to dismiss. The People's responses relied on section 6601.3, which allows an inmate to be held past his or her scheduled release date for up to 45 days "[u]pon a showing of good cause" in order to complete the necessary evaluations. Such "holds" had in fact been placed upon petitioners, and both petitions were filed within 45 days following the inmates' scheduled release dates.

In both cases, a declaration was filed by Sherry Barandas, who identified herself as the person in charge of "overall management" of the "Sex Offender Commitment Program." She stated that Hull's case was referred for evaluation on April 21, 2011, and Ammon's on April 19.[4] She stated that the initial screenings were delayed until July 1 and June 21, respectively, "due to the unavailability of clinicians and the number of cases on backlog . . . ." She also stated that the Department is staffed and funded to process 500 referrals a month, although it typically received an average of 729 referrals a month. She also stated that in April 2011 the Department received 1,593 referrals, with 1,466

---

[3] "A petition may be filed under this section if the individual was in custody pursuant to his or her determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed. A petition shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law." (§ 6601, subd. (a)(2).)

[4] Both Hull and Ammon were therefore referred for evaluation well over 45 days before their respective release dates.

4

following in May. At that point, according to Barandas, an emergency contract process was begun, but it was not approved until nearly the end of the year.

In both cases, a declaration was also filed by an employee of the Board of Parole Hearings (BPH), who was responsible for determining whether there was good cause to place a 45-day hold on an inmate under section 6601.3. In identical language, these persons disclaimed any specific recollection of the subject cases, but stated that their custom and practice was "to review the Controlling Release Date Query printout from the Offender Based Information System (OBIS) and DMH's Level II Clinical Screen before placing a 45-day hold." Their custom and practice before finding good cause was "to ensure that [¶] a. there was a qualifying offense under the SVP statutes. [¶] b. DMH's Level II Clinical Screen indicated that the inmate should be referred for another set of SVP evaluations. [¶] c. BPH had jurisdiction to place the hold." In other words, as long as the inmate had committed a qualifying offense and the initial screening did not eliminate him from consideration as a potential SVP, a hold would be placed. The declaration in the Hull case referred to the increase in referrals as being "good cause" as "exigent circumstances beyond DMH's control"; the Ammon declaration was silent on the point.

As a fallback position, the People also argued that any mistake with respect to petitioners' continued custody had been made in good faith. We will set out the additional evidence presented in connection with the habeas corpus petitions when we reach the "good faith" issue.

5

Hull and Ammon responded by arguing that the Department had actually been handling well over its supposed "staffing" level of 500 cases a month for most of 2010 and early 2011.[5] Petitioners also expressed skepticism about the possibility that the Department of Corrections and Rehabilitation had changed its policy concerning referrals without giving the Department advance warning.[6] Finally, petitioners asserted that the increase in referrals did not, as a matter of law, constitute "good cause" for the 45-day hold placed on them.

At the hearing, the trial court took the matter under submission, and in a written ruling found that petitioners had not established that the "spike" in cases could have been anticipated, that the "spike" constituted "equivalent exigent circumstances" within the meaning of section 6601.3, subdivision (b), (see *infra*) and that in any event the holds had been placed in good faith.

## DISCUSSION

### A.

The first question we decide is the interpretation of the statute. We will then turn to the question of "good faith."

---

[5] The chart filed by the People showed that for the last six months of 2010, there were 896, 785, 941, 706, 599, and 837 referrals; 655 followed in January 2011, 681 in February, and 773 in March, before the rate doubled from that in April and May.

[6] Petitioners simply asserted that "[y]ou don't have to be Einstein to conclude there was a change in policy regarding referrals . . . ." There was no actual evidence of such a policy shift.

At the heart of the matter is the 2010 amendment to section 6601.3, which added

subdivision (b).  (Text of amendment, *infra*.)  Prior to that time, the statute simply

allowed the 45-day hold if there was "good cause," but did not attempt to define the term.

Some background is provided by *In re Lucas* (2012) 53 Cal.4th 839 (*Lucas*).  That

case involved a regulation adopted to guide the interpretation of section 6601.3 prior to

the 2010 amendment.  At the time *Lucas* arose,[7] Code of Regulations, title 15, section

2600.1, subdivision (d), defined "good cause" as the existence of some evidence that the

person had a qualifying conviction and that he or she was "likely to engage in sexually

violent predatory criminal behavior."  The petitioner in *Lucas* was placed under a hold

justified by this authority.

The Supreme Court pointed out in *Lucas* that this was merely a formulation of

"good cause" to believe the inmate might be a sexually violent predator, *not* "good

cause" justifying the inability to process the evaluation in a timely manner.  It also noted

that under the interpretation urged by the People, "good cause" for the 45-day extension

would exist in *every* case because the initial screening would have already limited the

pool of affected inmates to those with a qualifying conviction and a negative initial

report.  (*Lucas*, *supra*, 53 Cal.4th at pp. 850-851.)  As a result, the court held that the

petitioner's continued custody was not lawful, but it also found the authorities' reliance

---

[7]  The *Lucas* court commented that by March 2012, when *Lucas* was decided, the regulation had not been revised to reflect the 2010 amendments defining "good cause." (*Lucas*, *supra*, 53 Cal.4th at p. 844, at fn. 3.)  It still hasn't.

7

on the regulation to have been in good faith so that the SVP petition had been properly heard. In this context, the court relied on legislative history to support the conclusion that "good faith" meant that the mistake was not due to intentional wrongdoing or even negligence by correctional authorities. (*Id*. at p. 852; see also *People v. Superior Court* (*Whitley*) (1999) 68 Cal.App.4th 1383, 1389-1390.)

As has been noted, by the time *Lucas* was decided the Legislature *had* amended the statute to *define* "good cause" for the purpose of retaining the inmate in custody past his or her release date. It did so by adding subdivision (b) to section 6601.3, which provides that "[f]or purposes of this section, good cause means circumstances where there is a recalculation of credits or a restoration of denied or lost credits, a resentencing by a court, the receipt of the prisoner into custody, or equivalent exigent circumstances *which result in there being less than 45 days prior to the person's scheduled release date for the full evaluation described in subdivisions (c) to (i), inclusive, of Section 6601*." (Italics added.) The simple question presented by these petitions is whether the sudden "spike" in referrals to the Department was an "equivalent exigent circumstance." The answer is "no."

It is apparent that the intent of the amendment was to deal with situations in which, for reasons beyond the control of the Department, it had fewer than 45 days in which to complete the evaluations. This might be the case, as the statute sets out, if an inmate's release date was suddenly advanced because he qualified for a restoration of lost credits. The same problem could occur if a court corrected a sentencing error and

8

reduced the inmate's term, or if an inmate were returned to custody for a parole violation, which resulted in a minimal term.

With all due respect to the People (see *infra*), we agree with their argument that the statutory language is unambiguous, and therefore needs no construction. If there is no ambiguity in the language, the court presumes the Legislature meant what it said, and the plain meaning of the statute governs. " 'If the statutory language is clear and unambiguous our inquiry ends.' " (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1250.) The amendment ensures that where the Department does not have the presumptively sufficient *time* in which to complete the evaluation, an inmate may be retained in custody beyond the scheduled release date. The exigent circumstances that will justify a continued "hold" must be "equivalent" to those set out in the statute *and* must result in "there being less than 45 days prior to the person's scheduled release date for the full evaluation . . . ."[8] (§ 6601.3, subd. (b).)

The Legislature certainly knows how to leave the determination of "good cause" up to the courts, as it did with the original version of Welfare and Institutions Code section 6601.3 and has done to a large extent in Penal Code section 1382, which deals with dismissals when statutory time limits for trial are not met. In that context, the courts

---

**8** We have used the phrase "fewer than 45 days" above because "fewer" should be used when the things being described may be counted; "less" is used when the quantity in question is abstract or imprecise. (E.g., "less money, fewer dollars," or "less time, fewer hours"; see <http://languagerules.wordpress.com/2006/09/08/fewer-vs-less/> [as of Dec. 14, 2012].) However, in quoting the statute, we are of course bound by the Legislature's choice.

9

have held that an unexpected increase in a court's workload that prevents it from affording a defendant his trial within the statutory time period *may* constitute "good cause" to prevent dismissal. (See generally discussion in *People v. Engram* (2010) 50 Cal.4th 1131, 1162-1165.) But in our case, the Legislature has *not* left it up to the courts to determine "good cause" on a case by case basis. It has explicitly limited the courts' power to find "good cause" by adding the qualification that the proffered excuse must "result in there being less than 45 days prior to the person's scheduled release date for the full evaluation . . . ." (§ 6601.3, subd. (b).) Whether this limited definition of "good cause" was wise is not for us to decide. The language could hardly be more clear, and we cannot expand a definition that the Legislature has expressly chosen to limit.[9]

---

[9] We have not found it necessary to rely on a case cited by petitioners, *People v. Superior Court* (*Small*) (2008) 159 Cal.App.4th 301 (*Small*). That case decided that an "increased workload" (not shown to be unusual or unpredictable) did not constitute a "good faith mistake of law or fact." (*Id.* at pp. 309-310.) Because the inmate in that case had been held beyond the 45-day period allowed by section 6601.3, "good cause" was no longer an issue and, in fact, the 45-day extension was not challenged.

Nor do we feel it necessary to argue the maxim *noscitur a sociis* (a thing is known by its associates, or the things with which it is associated). The Legislature did not leave us only the "*sociis*" to assist in our analysis; it made the limited category into which all "*sociis*" must fit *explicit*. Still less do we find it necessary to address the People's assertion that any *noscitur a sociis* argument was waived either because petitioners did not cite the maxim in the trial court or did not properly present all relevant legislative materials through judicial notice. We do note that petitioners did urge not only that none of the specific circumstances stated in section 6601.3, subdivision (b), existed, but that there was no showing of "any exigent circumstances that resulted in there being any good cause for implementation of the hold as required by 6601.3(b)." This adequately asserted that the statutory requirements had not been met, and it is certainly not uncommon for arguments to be made in more detail and with more scholarship in appellate briefs. For example, the People certainly did not favor the trial court with the multiple dictionary definitions for "equivalent," "exigent," and "circumstances" with which it has attempted to persuade this court.

However, insofar as we have not already done so, we will address the People's arguments at least briefly.

The People argue both that section 6601.3, subdivision (b), is unambiguous and that, if it is ambiguous, it should be construed to confirm the ruling of the trial court—and that in either event "[p]rinciples of statutory construction unquestionably lead to the conclusion that a [spike] is an 'equivalent exigent circumstance' establishing 'good cause' . . . ." In an effort to establish unambiguity, they provide us with complete sets of Merriam-Webster[10] definitions for the words "equivalent," "exigent," and "circumstance"[11] and, by picking and choosing, conclude that the phrase as used by the Legislature "means an equally important event calling for immediate aid or action." We do not consider this at all useful because whatever synonyms or rephrasing are employed, construction of the phrase "equivalent exigent circumstances" remains subject to the limitation that the "equally important event calling for immediate aid or action"[12] must result in "less than 45 days in which to complete the evaluation . . . ." The People's

---

*[footnote continued from previous page]*

Finally, we have not found it necessary to consider any legislative history other than that set out in the published cases, e.g., *Lucas*, *supra*, 53 Cal.4th 839.

[10]  Cited as <http://www.merriam-webster.com/dictionary> (as of Dec. 14, 2012).

[11]  One of the definitions for "circumstance" is "3: attendant formalities and ceremonial," with the example given "pride, pomp, and circumstance of glorious war—Shakespeare." This is not in the least germane to the case.

[12]  The People also describe this as a "severely homeostasis-changing event."

11

analysis simply and persistently ignores this limiting clause. The question is *not* whether an unanticipated "spike" in referrals constitutes good cause to impose a 45-day hold; quite arguably it would, if the Legislature had left the term unadorned. But it did not.

The People also argue that if we do not accept their flexible interpretation of "equivalent exigent circumstances," the term will become meaningless because "no other exigent circumstances could ever exist." We agree with the People that this phrase was probably included as a safeguard in case the Legislature had forgotten or just not thought of other situations that should permit the 45-day hold to be imposed. But we disagree that there are "no other" circumstances that would also satisfy the condition of reducing the 45 days in which to complete an evaluation. An inmate might be pardoned, or his sentence commuted; records might be destroyed or become temporarily unavailable due to a natural disaster; operations might be affected for a similar reason. (See Cal. Rules of Court, rule 8.66, authorizing the Judicial Council to extend deadlines where operations affected by public emergency.)[13] Given the express conditioning of "equivalent exigent circumstances," it is far more likely that the Legislature was just being careful rather than that it intended to vastly expand the scope of further exceptions.

The People also rely generally on the policy, presumably part of the legislative decision-making process, "to preserve the government's ability to commit dangerous

---

[13] We do not, of course, hold that any or all of these circumstances *is* an "equivalent exigent circumstance"; we only wish to rebut the People's argument that the statute's list is "entirely exhaustive of that class of events"—that is, events that would reduce the 45-day period.

SVPs," citing inter alia *People v. Paniagua* (2012) 209 Cal.App.4th 499, 506-507

(*Paniagua*).[14] The quick answer to this is that in *Lucas*, the court pointed out in

responding to a similar argument that there are *two* public policies at stake—the public's

interest in being protected from a potential SVP, and the inmate's liberty interest in being

freed once all legal bases for confinement have expired. It also noted the stigma attached

to an SVP finding and the likelihood that an inmate may be subjected to "unwanted

treatment consequent upon an SVP finding." (*Lucas*, *supra*, 53 Cal.4th at p. 851.) In

drafting subdivision (b) of section 6601.3, the Legislature clearly balanced these interests,

and the fact that the People disagree with the plain result of the Legislature's balancing

does not influence our analysis.

B.

We now turn to the People's fallback position—that the officials at the

Department made a "good faith mistake of fact or law." This time, we agree.

In *Lucas*, the court noted previous decisions holding that a "good faith mistake of

law" was one that did not involve either negligent or intentional wrongdoing by

correctional authorities. (*Lucas*, *supra*, 53 Cal.4th at p. 852; see also *In re Smith* (2008)

---

**14** *Paniagua*, *supra*, 209 Cal.App.4th 499, legally is similar to *Small*, *supra*, 159 Cal.App.4th 301, in that the section 6601.3 hold was not challenged, but the petition was not filed until the hold had expired and the inmate should have been released. The court rejected the inmate's contention that the failure to meet the statutory time limits *automatically deprived the court of jurisdiction*. As the inmate conceded that the authorities had acted in good faith, the petition was upheld. There is no discussion of the "good faith" issue.

13

42 Cal.4th 1251, 1260.) It then held that the authorities acted in good faith in relying on the definition in the regulation, "given that no previous judicial decision questioned its validity and that the Courts of Appeal in these very cases [that is, the consolidated similar cases decided under the heading *In re Lucas*] split on the question." (*Lucas*, *supra*, 53 Cal.4th at p. 853.) Similar is *People v. Superior Court* (*Whitley*) (1999) 68 Cal.App.4th 1383, in which the inmate's parole had been revoked and he had been returned to custody under a regulation subsequently held invalid. That court also found merely a "mistake of law" concerning the scope of the Department of Corrections' (as it was then) power to establish regulations governing parole. Also recently, the Court of Appeal found an excusable mistake on the part of the People in *Langhorne v. Superior Court* (2009) 179 Cal.App.4th 225 (*Langhorne*). There, following the amendment of the SVPA to provide for indeterminate rather than two-year commitments, the People filed motions in several cases to "convert" the commitments to indeterminate, and these trial court motions were granted. Shortly thereafter, however, an appellate court ruled that inmates were entitled to full new hearings before the commitments were converted. (*Id.* at p. 235; *People v. Whaley* (2008) 160 Cal.App.4th 779, 803.) Hence, the "converted" terms of the inmates in *Langhorne* were illegal, and by the time the People filed appropriate conversion petitions any "legal" custody had expired. The appellate court agreed that the People's decision to proceed by way of motion in the first place was reasonable, given that the

14

statutes did not provide for an explicit procedure and no appellate court had held otherwise. (*Langhorne*, *supra*, 179 Cal.App.4th at pp. 239-241.)[15]

We now turn to this case and the decisions that led to the retention of petitioners in custody past their scheduled release dates. We first note that there is no evidence whatsoever of intentional wrongdoing or willful disregard of the law. Rather, in our view, the record supports the conclusion that Department personnel made good faith decisions in an attempt to balance the statutory requirements against the unexpected accumulation of referred cases.

The declarations filed by the People in opposition to the motions to dismiss set out the facts relating to the "spike" in filings, and both of the Department employees responsible for the decisions to place essentially declared that they had apparently applied the regulatory standards, which would shortly be held invalid in *Lucas*.[16] That is, because petitioners had each suffered a qualifying conviction and there was reason to believe that each was an SVP, a hold was considered proper. This initially suggested that Department personnel were ignorant of the changes to section 6601.3. However, materials submitted in connection with the petitions for writ of habeas corpus show that

---

[15] The *Langhorne* court also relied upon the fact that the trial courts had agreed with the People's position when they filed the (improper) conversion motions as evidence that the matter was not clear and that reasonable minds could differ. (*Langhorne*, *supra*, 179 Cal.App.4th at p. 239.)

[16] We may agree, arguendo, that if section 6601.3 had not been amended, these declarations would show "good faith," as the *Lucas* court acknowledged that the regulation was not clearly invalid.

the Department was in fact aware of the changes and was grappling with how to apply them.

On June 27, 2011, Brian Kelley of the Department sent an email to Rhonda Skipper-Dotta, also of the Department, noting the changes to section 6601.3 and commenting that the Department might have to change its practice of routinely placing the holds "at the request of DMH." Dan Moeller—who filed the declaration in petitioner Ammon's case—had apparently first raised questions, and was copied with the email.

Skipper-Dotta responded the same day, as follows: "Agreed. Unless the reason for the requested 45 day hold is in the law, BPH cannot place the hold. However, if there is an exigent circumstance that is not specifically enumerated in the statute BPH can place the hold, BUT those circumstances need to be identified and explained clearly in the request to BPH. If not, then there is not good cause to place the hold."

The next day, June 28, 2011, Moeller sent an email to over 20 persons, all apparently deputy commissioners with BPH. The purpose was to inform and remind the deputies "on the required criteria for granting a request for a 45 day hold on a parolee pending an SVP evaluation. As noted in the memo [which was attached] any request for an SVP hold has to be for good cause, and the definition of good cause is clearly listed in WI 6601.3(b)." The attached memo set out section 6601.3 in full, and after discussing the listed "exigent circumstances," noted another possible situation which would qualify. Tellingly, the memo goes on to express the view that "The following circumstances are **not considered good cause** to place a 45 day hold: [¶] . . . [¶] Late evaluations due to a

16

shortage of clinicians.  [¶]  Additional time needed awaiting results of evaluations from clinicians."  (Emphasis in original.)

Thus, initially someone—at least the author of the memo, whether it was Moeller or another—interpreted section 6601.3, subdivision (b), just as we have—that having too few clinicians to handle the workload ("spiked" or not) was not "good cause." Furthermore, this view was disseminated to the decision-makers.

Nevertheless, the matter was evidently not considered settled, because on July 5, 2011, a new email was sent by Jennifer Shaffer, identified as the "Executive Officer Board of Parole Hearings."  She informed the recipients that "BPH has determined that the recent dramatic increase in CDCR referrals to DMH for SVP screening and evaluation to be an exigent circumstance for which 45-day holds may be issued."  Shaffer went on to inform the recipients that "BPH staff have estimated that this exigent circumstance will last through the end of July.  Therefore, I am putting everyone on notice, that absent additional unforeseen circumstances, effective August 1, 2011, BPH will consider the current exigent circumstance to have ended . . . .  BPH will [after that date] issue 45-day holds only upon a showing of good cause, as defined in statute: Circumstances where there is a recalculation of credits, restoration of denied or lost credits, resentencing by a court, receipt of the prisoner into custody, or equivalent exigent circumstances which result in there being less than 45 days prior to the person's scheduled release date for the full evaluation.  **BPH will not, as a general rule, consider**

17

**staffing shortages or routine delays to be an exigent circumstance."** (Emphasis in original.)

This communication, sent by a person with supervisory decision-making authority, recognized the limited nature of "good cause" as defined by the Legislature, but at the same time stressed the unprecedented nature of the "spike" in referrals, which indisputably created an exigent circumstance affecting the timely processing of referrals. Shaffer no doubt recognized the serious threat to public safety, and the contravention of the entire public policy and concern that resulted in the enactment of the SVPA in the first place. From other documents, it is clear that the Department was not indifferent to the problem, as the declaration of Sherry Barandas, to which we have referred *ante*, also indicated that efforts were being made to hire or contract with additional qualified evaluators. Furthermore, the directive was carefully time-limited, again acknowledging that the limitations of the statute should not be loosely interpreted. The procedure mandated by BPH's executive officer was carefully structured to protect the public while restricting the effect of the directive and thereby effectively encouraging the Department to address the "spike."

It is true, of course, that in the first part of this opinion we somewhat forcefully expressed our disagreement with the People's interpretation of section 6601.3. But what seems clear to us, from a position in which we have had ample time to study and analyze the statutory language and existing law, may well not have seemed so clear to Ms. Shaffer and other policy-making employees seeking an immediate solution to what we

agree was an emergency. In this respect, we note that the trial court also adopted the People's interpretation, another sign that reasonable minds might reach different conclusions as to the legislative intent. (See fn. 15, *ante*.)

## DISPOSITION

Accordingly, petitioners win one battle, but lose the crucial one. Although the "spike" did not constitute an "equivalent exigent circumstance" under section 6601.3, the Department could in good faith have believed that it was and there is no evidence that their conclusion to that effect was meretricious. The petitions for writ of mandate and petitions for habeas corpus are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


CODRINGTON
J.

We concur:


RAMIREZ
P. J.


HOLLENHORST
J.