Filed 2/20/14  P. v. Consiglio CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063173 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. MH107124) |
| SAM CONSIGLIO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Sam Consiglio appeals an order involuntarily committing him for an indeterminate term to the custody of the State of California Department of State Hospitals (DSH) after

the trial court found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA or Act) (Welf. & Inst. Code,[1] § 6600 et seq.). Consiglio contends (1) the evidence, including the prosecution's expert testimony, is insufficient to support the court's finding that he is an SVP; (2) the court erred by denying his pretrial motion to dismiss the SVP proceedings; (3) the SVPA violates his federal and state constitutional rights to due process of law, violates double jeopardy prohibitions, and constitutes a punitive post facto law; and (4) his indeterminate commitment under the SVPA violates his constitutional right to equal protection under the law, and his case must be remanded for a hearing to determine whether the SVPA as applied to him violated this fundamental right.  We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Factual Background*

1.  *The People's case*

a. *1978 rape of Jacqueline M.*

Jacqueline M. testified that Consiglio sexually assaulted her in April 1978 when she was 21 years of age.  She was serving in the military and was assigned to an air base in Michigan.  During a rain storm, her car would not start and Consiglio, who was driving by, offered to fix her car.  He started Jacqueline's car and followed her back to her residence.  Consiglio left.

---

[1]	Undesignated statutory references will be to the Welfare and Institutions Code.

The next night, Consiglio returned to Jacqueline's residence and she agreed to take a short drive in his new car. Consiglio drove off the military base, stopped, reached over to kiss Jacqueline, and grabbed her by the hair. When she grabbed his beard to try to get him to let her go, he grabbed her around the neck and started banging her head against the seat. Consiglio slapped her across the face, knocking off her glasses. He told her he was not going to rape her; he was going to "dry rock" her. Consiglio undid Jacqueline's pants, reached into her vagina, put his hand up her shirt to her breast, and ejaculated. He then drove her back near the military base. Jacqueline got out of the car, ran to a military police officer's car, and reported what had happened.

About 18 months later, Jacqueline testified at Consiglio's criminal trial. Prior to the trial, Consiglio phoned her. He told her in a very threatening tone that he knew where she lived and had been watching her.

b. *Testimony of Consiglio's siblings and friends*

*Louis Consiglio*

One of Consiglio's brothers, Louis Consiglio, testified that they grew up in Michigan, and Louis[2] did not know Consiglio well because Consiglio was always in jail. When Consiglio was home, the neighbors stayed off the street because they were afraid of him. In 1975 Louis's girlfriend told him that Consiglio tried to rape her. The incident was not reported to the police.

---

[2]     The use of some first names is solely for the purpose of clarity.

Louis testified that in 1991 he overheard Consiglio talking about a drug called GHB. Consiglio explained to Louis that this drug was used to have sex with women without their knowledge. Consiglio also told Louis how to write down the license plate numbers of women he saw and then use the license plate numbers to find out who they were.

According to Louis, Consiglio married Karen Thompson while Consiglio was in prison. Louis and Karen became friends over the phone. Consiglio became upset that Louis was communicating with Karen. In 1993 Consiglio sent Louis a letter from jail warning him to stay away from Karen and telling him he would hurt Louis's daughter if he did not stay away from Karen. In a second letter to Louis, Consiglio warned him not to testify or he would rape Louis's daughter and videotape it. Consiglio also threatened to have sex with Karen's 14- and 15-year-old daughters.

*J. C.*

Consiglio's brother, J. C., testified that he (J.) joined the Navy when Consiglio was about 12. In 1968 J. left the Navy. He returned to Michigan when Consiglio was 16 or 17 years old. J. received a call from their brother, Louis, who told him Consiglio had raped J.'s teenage daughter. J. was very upset, but did not call the police. The rape took place in 1980 or 1981 when J.'s daughter was 14 or 15.

J. also testified that in about 1992 Consiglio sent letters to him threatening to blow up his house or car or to take legal action regarding money from their parents' estate.

4

*A. C.*

A. C., who is Consiglio's niece and J. C.'s daughter, testified she was born in 1966. Sometime in the early 1980's, when she was 13 or 14 years old and Consiglio had been released from prison, she spent the night at his apartment along with her other cousins. A. woke up that night to the sound of panting. Consiglio, who was unbuttoning her pajamas, put his mouth on her nipple. He carried her over to the Christmas tree, laid her down, took off her pants and pulled down his pants. A. testified that Consiglio then covered her mouth with his hand and raped her while she was struggling to get him off of her. Two years later she told her uncle, Louis Consiglio, what had happened.

*V. K.*

V. K., who is Consiglio's sister, is two years younger than Consiglio. When she was about 12 years old, Consiglio would come often to where she was sleeping, pull her pants down, and start breathing heavily. V. would pretend to be asleep because she was terrified. Consiglio did not touch her, but looked at her private parts. Consiglio had a reputation in the community for being dangerous to the women and girls living there. V.'s female friends were not allowed to come over to her house because of Consiglio. Consiglio asked her to testify on his behalf and say she had a telephone conversation with him at a particular time on a particular day, but she refused.

*Wava Howley*

Wava Howley testified that she started writing to Consiglio in 1987 while he was in prison. She visited him there in 1988, and they frequently spoke to each other on the phone. In 1991 Consiglio told her he had been rearrested in San Diego for raping a girl,

5

but claimed that he had not committed the rape and that he had been on the phone with Howley during the alleged incident. She realized Consiglio was not truthful about talking to her on that occasion.

Howley testified that Consiglio told her he "psychologically raped" a woman by pretending to be a police officer so she would have sex with him to avoid being arrested. Howley also testified that Consiglio told her in a letter he was in love with a therapist at jail, and he had a dream about showing up to her house with a gun. He said it was one of his best dreams.

*Ernest Dorling*

Ernest Dorling testified he met Consiglio in 1960, when Dorling was nine years old, and they became very close friends. Consiglio frequently stole merchandise and cash from a department store where they both worked. When Dorling was 13 or 14 years old, he and a friend helped build a boat dock at a man's residence in Michigan. While the man was gone one day, a young girl came down to the dock. Consiglio stopped by and tried to converse with the girl. When the girl went back to the house, Consiglio left the dock. Dorling heard screaming coming from the house. When he ran inside the house, Dorling found Consiglio in one of the upstairs bedrooms assaulting the girl. (3RT 121:20-21)

A couple years later, Consiglio told Dorling he had raped a woman he found in a shopping center parking lot loading groceries into her car. He told Dorling he forced the woman to drive to a secluded location and then raped her in the car with her two children present.

In 1990 or 1991, Consiglio told Dorling he had been in prison. After he moved to California, Consiglio called Dorling regularly. He told Dorling he was arrested for two separate sex offenses in San Diego. Consiglio subpoenaed Dorling to testify at one of the trials because he was claiming he was on the phone with Dorling when one of the offenses was committed.

Dorling decided to write a book about Consiglio. Consiglio was eager to have his story told, and he consented to talk about his criminal history. In 1994 Dorling began interviewing him in jail. They discussed Consiglio's arrests and cases in which he was accused of sexual assault or rape. Consiglio said he grabbed a woman's breast in a grocery store when he was 12 or 13. He talked about the incident with the daughter of the dock owner and said he would have raped her if she had not screamed. Consiglio talked in detail about raping the woman in the grocery store parking lot, saying that he picked her because he thought she would do anything to protect her two small children.

Consiglio told Dorling about three incidents in 1968 in which he tried to attack women in cars who had stopped and asked for directions. He also told Dorling about an incident in December 1968 when he saw an ad placed by a woman looking for an apartment. Consiglio contacted her and represented he was a "high roller" with apartments he could make available to her. He showed her some apartments and then took her to a motel. Consiglio said he raped the woman. He told Dorling he was able to figure out that the woman was intimidated and afraid of him, and he was able to take advantage of her intimidation and fear.

7

Consiglio told Dorling about an incident in 1972 in which he met a woman when he was working as a furniture delivery driver. He assaulted her, but stopped before he raped her. Consiglio said he served 90 days in jail for the assault.

Consiglio also described an April 1974 incident in which he had nonconsensual sex with a 16-year-old girl who was hitchhiking. He told Dorling about a March 1976 incident in Las Vegas in which he met a prostitute and robbed her of about $300 after having sex with her in a motel. Although Consiglio was arrested, the victim did not show up in court and, after the charges were dropped, he went to the prosecutor and demanded the $300.

Consiglio told Dorling he faked mental illness to receive Social Security benefits and to get delays in court proceedings.

Dorling and Consiglio discussed the April 1978 incident involving Jacqueline, the woman stationed at the air force base, and Consiglio said this incident resulted in his first felony conviction and he was sent to prison for this crime.

Consiglio told Dorling that, in 1984 when he was out on parole, he attempted to assault a woman he had assaulted six years earlier. His parole was revoked, and he was sent back to prison. Consiglio was very proud of his ability to manipulate women and institutions. He also told Dorling about a prostitute who was married to a young man in the Navy and how he threatened to tell her husband he was having sex with her if she did not continue having sex with him for free.

Consiglio also told Dorling about a prostitute in San Diego who thought he was a police officer and how he was able to have sex with her at no charge by not correcting

8

her.  Consiglio told Dorling about a number of other incidents involving women that Dorling included in his book.

c. *2011 incident with Nancy L.*

Nancy L. testified that Consiglio approached her near a grocery store on April 11, 2011, claiming he was an "advocate" who was hiring for the YMCA.  He gave her his card and a YMCA application to fill out.  Nancy filled out the application with her address and gave it to him.

Consiglio came to her house unannounced early in the morning a couple days later, entered, and woke her up.  He gave her a hard massage, rubbing her back and shoulders.  Later, Nancy got into his car expecting to go to the YMCA for an interview.

Consiglio drove past the YMCA.  During the ride, Consiglio persistently asked her to drink a cup of coffee he brought her.  When Nancy continued to refuse, Consiglio became really angry.

Consiglio parked near his house and told Nancy to go inside.  He said the job was inside and she had to fill out the applications.  When she refused to go inside, Consiglio became very angry.  Finally, when she refused to go in the house, he slammed the door and started walking back to the car.

When they returned to the car, Consiglio touched Nancy's leg, told her she was pretty, and said, "You can have anything you want."  Consiglio then grabbed her face and kissed her.  He asked her whether she would have sex with someone for money, and she said no.  Later that day, Consiglio sent her a text message saying he was really angry she did not take the job and asking her to return some grocery money he had given her.

9

San Diego Police Officer Angela Bull testified that she spoke with Nancy on April 17, 2011, about what had happened on April 11 and obtained the business card with Consiglio's name on it. Officer Bull went to Consiglio's apartment and during a search found YMCA membership applications. Three of the applications were completed by women, including Nancy's. Other applications were blank.

d. *Prosecution experts*

*Dr. Arnold*

Dale Arnold, Ph.D., a psychologist employed by DSH, had worked in the military treating persons with anxiety and depression. He received specialized training regarding evaluation and treatment of sex offenders. As an evaluator for the State of California, he trained other psychologists to be evaluators. Dr. Arnold had performed about 550 civil commitment evaluations. Since 1999 he had found 17 percent of those he evaluated met the SVP criteria.

Dr. Arnold evaluated Consiglio and prepared a report. The parties stipulated that the first SVP criterion was satisfied in that Consiglio had been convicted of committing a sexually violent offense against one or more victims.[3]

Regarding the second SVP criterion, Dr. Arnold diagnosed Consiglio with both paraphilia not otherwise specified (paraphilia NOS) and antisocial personality disorder

---

3    "To classify a person as an SVP, it must be shown that (1) the person has been convicted of a sexually violent offense against one or more victims; (2) the person has a diagnosed mental disorder; and (3) the person's mental [disorder] makes him likely to engage in sexually violent criminal behavior." (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1080, fn. 2, citing § 6600, subd. (a)(1).)

with narcissistic traits.  Paraphilia is listed in the Diagnostic and Statistical Manual (DSM) under sexual behaviors.  For a person to be diagnosed with antisocial personality disorder, there must be some evidence the person suffered from a conduct disorder prior to the age of 15 years, and at least three of the following seven features or criteria listed in the DSM must be present since the age of 15 years:  (1) failure to conform to social norms, (2) deceitfulness, (3) impulsivity or failure to plan ahead, (4) irritability or aggressiveness, (5) reckless disregard for the safety of others, (6) consistent irresponsibility, and (7) lack of remorse.

In support of his opinion that Consiglio suffers from antisocial personality disorder, Dr. Arnold testified there was evidence Consiglio suffered from a conduct disorder at the age of 13 in that he committed thefts at that age.  There was also evidence he committed sexual assaults at age 13 by grabbing the breasts of five different women in a shopping mall.  Dr. Arnold also opined that Consiglio met all seven of the foregoing criteria listed in the DSM.  Consiglio's lack of remorse was "especially impressive" to Dr. Arnold.  Consiglio went to a shelter purportedly looking to hire a property manager, met Karen G. there, unsuccessfully used her as an accomplice in trying to fraudulently manipulate an apartment complex into hiring them by claiming they had more experience than they had, and then blamed Karen and claimed she falsely accused him of rape because she did not get the job.  The 2011 incident with Nancy L. (discussed, *ante*) was similar in that Consiglio claimed he did nothing wrong and blamed the victim for the situation.

11

Regarding the second diagnosis, paraphilia NOS, Dr. Arnold testified that paraphilia means a deviant attraction. The general criterion for a diagnosis of paraphilia is that, for a period of six months or more, the person has recurrent, intense sexual urges, fantasies, or behaviors related to such deviant sexual behaviors as (among other things) voyeurism, exhibitionism, and pedophilia. The second criterion for paraphilia is that because of the deviant fantasies, urges, or behaviors, the person suffers from distress or dysfunction. Dr. Arnold testified that, although the DSM-IV-TR lists eight paraphilias, several experts in the field, including the editor of the DSM, have acknowledged there are hundreds of paraphilias because a person "can technically have a deviant sexual arousal to almost anything."

Dr. Arnold opined that Consiglio has a deviant sexual attraction to nonconsensual situations and testified that "loads of data" support this diagnosis. At age 13, Consiglio grabbed women's breasts in a shopping mall. At age 14, he attempted to rape a 15-year-old girl. At age 16, Consiglio attempted more sexual assaults. At age 17, he raped a woman in her car with her children present. Consiglio went on to commit several more rapes. During an arrest in 1972, Consiglio asserted, "I don't have those urges any more," which Dr. Arnold opined was an acknowledgement that Consiglio had had urges to sexually assault women. Dr. Arnold testified that Consiglio then "reoffend[ed] the next year and years after that."

Dr. Arnold testified that sometimes, when a man has a deviant sexual attraction to nonconsensual situations, his underlying fantasy is that the woman he is accosting is going to be "turned on" by the sexual assault and grow to love him. Such a fantasy is

12

described in a case study in the DSM. According to Dr. Arnold, Consiglio wrote in 1992 about a dream he had that involved his therapist. In the dream, Consiglio showed up at her house with a gun, he openly acknowledged she was afraid; but, by the end of the night when the police arrived, she ran and hugged him. Consiglio described that dream as the best dream he ever had. Dr. Arnold commented that it was "just kind of remarkable" that Consiglio "had the same type of fantasy that's even described as [a] case study within the [DSM]."

Dr. Arnold testified that Consiglio had engaged in a "repetitive pattern of behavior starting at the age of 13" that was "[l]ast repeated at the age of about 59"; and, thus, Consiglio had "almost 40 years of behaviors in response to urges to engage in nonconsens[ual] sexual contact."

Dr. Arnold explained that when the DSM-III was revised, it did not list paraphilic coercive disorder as a separate disorder because victim groups feared that perpetrators of sexual crimes could use it as a means to avoid responsibility. However, the revised DSM "described what would have been diagnosed as paraphilic coercive disorder with the instruction that if you encounter a person like this, then the proper way to diagnose it is as paraphilia [NOS] because it is not included as [its] own category within the DSM."

Dr. Arnold opined that Consiglio had "developed a psychological attachment to being in a powerful, coercive role when it comes to his sexual expression" and that "it is difficult for him to be aroused and interested" in consensual situations because it is far more arousing for him to be involved in physically or psychologically coercive situations.

13

Dr. Arnold indicated that not all rapists suffer from paraphilia, but reiterated his opinion that Consiglio does suffer from a chronic paraphilia as it relates to nonconsenting sexual partners. He indicated that the large number of sexual assaults Consiglio had committed during his criminal career was extremely unusual. Dr. Arnold opined that Consiglio's "persistence over time is extraordinarily rare." The incident involving Nancy L. in 2011 is particularly important because it demonstrates a total lack of volitional control, and shows he is "psychologically excited by forcing a person into sex." The fact that Consiglio had an ongoing consensual relationship, was undergoing psychotherapy, and was motivated to avoid being returned to prison on a parole violation at the time, demonstrates his inability to resist his urge to engage in nonconsensual sex.

Dr. Arnold opined that Consiglio's paraphilia, his antisocial personality disorder, or a combination of both affect his ability to control his conduct with regards to reoffending. His scores on predictive recidivism tests indicated a high risk of reoffense. Dr. Arnold believed Consiglio's scores underestimated his risk of reoffending because of his persistence in committing sexual offenses over time, the number of times he has been sanctioned, and the number of times he has been in treatment.

Dr. Arnold opined that Consiglio is not amenable to voluntary treatment, and he needs to be in a secured facility for treatment. Dr. Arnold also opined there is a serious and well-founded risk that Consiglio will engage in sexual offenses involving force, menace, and duress against victims with whom he establishes relationships unless he is placed in custody in a secured facility.

14

*Dr. Damon*

Will Damon, Ph.D., a psychologist, began working for DSH in 2007. He received education and training in sex offender evaluation and treatment and has worked for DSH as an evaluator.

Dr. Damon conducted an evaluation of Consiglio and wrote a report. Dr. Damon testified he had completed 322 sexually violent predator evaluations and found 16 percent of the subjects met the SVP criteria. He found that Consiglio met the second SVP criterion as he diagnosed Consiglio with paraphilia NOS and antisocial personality disorder with narcissistic features. Dr. Damon based the paraphilia NOS diagnosis on his conclusion that Consiglio is aroused by abusive sexual control over women. In support of this conclusion, Dr. Damon found Consiglio had 15 arrests for sexual assaults over a 27-year period and a recent overt act in the community that mirrored his pattern of offending. Consiglio is a serial offender with a long history of sexual assaults who admitted deviant sexual arousal early in his history. In 1972 Consiglio admitted having rape urges. Even when he has had an opportunity for consensual sex, he has chosen to make it coercive, as in the cases of his experiences with prostitutes. In 1991, when he raped Karen, he kept his hand on her throat throughout the rape despite the fact that she was no longer resisting. During a 2010 evaluation, Consiglio said he convinced his wife to engage in anal sex despite his knowledge she did not like it. When she started to enjoy it, he stopped engaging in it because it was no longer exciting to him. Consiglio wrote to Howley about a dream he described as the most beautiful dream he ever had, and the clear theme of the dream was abusive sexual control during a home invasion with a gun.

15

Regarding the third SVP criterion, Dr. Damon testified that Consiglio reoffends quickly following sanction. There is a distinction between rapists who are generally antisocial and commit isolated and opportunistic sexual assaults, and Consiglio, who is a "specialist" who engages in repetitive and planned sexual assaults. The fact that Consiglio began his sexually assaultive behavior at age 13 and has continued this behavior persistently indicates an increased risk for reoffending. Consiglio continues to suffer from paraphilia NOS as evidenced by his parole violation behavior in 2011. Dr. Damon also testified that the diagnosis of antisocial personality disorder was based on Consiglio's use of deception; his impulsivity in continuing to commit sexual offenses despite sanctions, including a 2011 parole violation; his aggressiveness, irresponsibility, and lack of remorse for his sexual offenses; and the signs he suffered from conduct disorder prior to the age of 15.

Dr. Damon opined that as a result of the two mental disorders, Consiglio was a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior. In explaining the basis for this opinion, Dr. Damon testified that Consiglio scored a "6" on the Static-99, indicating a high risk of reoffending. Consiglio has other dynamic risk factors that indicate an increased risk of recidivism above and beyond the factors shown on the Static-99. The early age of the onset of his offending, the "density" of his sexual offenses, his persistence in offending, and his specialization in those offenses show that Consiglio is an uncommon sexual offender with a high risk of reoffending. His conduct toward Nancy L. in 2011 was similar to the pattern of his prior sexual offenses.

16

Dr. Damon opined that Consiglio is not amenable to voluntary treatment if he is released into the community. Consiglio poses too high a risk to women in the community to be treated on an outpatient basis.

2. *Defense case*

William Hobson, a staff attorney with the California Parole Advocacy Program of the McGeorge School of Law Institute of Administrative Justice, represented Consiglio at the June 2011 parole revocation hearing. Consiglio was charged with four violations of parole. Nancy L. was one of the witnesses who testified at the hearing. The charge alleging he drove a motor vehicle with a female (Nancy L.) without permission was sustained. Consiglio challenged the finding by filing a request for review by the Board of Parole Hearings (BPH).

Hobson testified that the tape recording of the revocation hearing was apparently lost and unavailable, and as a result, the BPH in February 2012 ordered a new parole revocation hearing on the sustained charge. The second hearing was held in June 2012, but at that point the one-year sentence Consiglio was given for the parole violation had expired. Consiglio served the full year in custody based on the charged violation of parole.

a. *Defense experts*

*Dr. Abrams*

Alan Abrams, who is a physician, psychiatrist and attorney, testified he had treated 30 or 40 sex offenders and had evaluated over 100 for treatment. In August 2012 Dr. Abrams evaluated Consiglio in prison.

17

Dr. Abrams opined that Consiglio did not meet the SVP criteria because he did not have a mental disorder that would predispose him to sexually violent criminal behavior in the future, and his risk of committing sexually violent behavior in the future was low. Dr. Abrams testified that paraphilia NOS is a category in the DSM-IV-TR because there is an "infinite" variety of ways a person can have deviant sexuality. However, "paraphilia NOS nonconsent" is not a diagnosis, and the American Psychiatric Association has rejected it from the DSM-IV-TR.

According to Dr. Abrams, a paraphilic rapist is a person who primarily, and with rare exception, is only able to achieve sexual climax by forcing unwanted sex on an unwilling victim. A paraphilic orientation and dysfunction is indicated by the loss of interest when a partner willingly agrees to have sex and by an inability to enjoy sex with a willing partner. The SVP law requires volitional impairment, a mental disorder that imposes either irrational out-of-control or compulsive behavior the person is not able to control. The fact that someone is a repeat rapist does not necessarily mean that person is paraphilic.

Dr. Abrams testified that antisocial personality disorder (ASPD) is a diagnosis in the DSM that refers to a person who has little or no care about social norms or about how much they hurt people and whose disregard for other people's rights has continued from the early teens. A person with ASPD might become a serial rapist. A person can have ASPD and a paraphilic sexual disorder, as the disorders are not exclusive. To determine that paraphilia is driving the serial rapist's sexually violent behavior requires evidence in addition to repeated criminal actions.

18

Dr. Abrams diagnosed Consiglio with anxiety disorder and erectile dysfunction. He also diagnosed Consiglio with personality disorder NOS with antisocial, narcissistic, self-defeating, and borderline features. Dr. Abrams did not conclude that Consiglio has a paraphilia because there was nothing in the materials that distinguished him from the majority of opportunistic rapists. Consiglio had not committed a rape since 1991 despite being in the community for two years. His conduct with Nancy L. would be inconsistent with a paraphilic rapist compelled to commit rape. Consiglio said he was ashamed of his past and described a current and more normal boyfriend-girlfriend relationship with his girlfriend with the exception that they did not have sexual intercourse. His lack of sexual functioning seemed to be related to anxiety. Dr. Abrams found no evidence that Consiglio was playing out nonconsensual sexual fantasies with his girlfriend or prostitutes, and Consiglio has not revealed any desire to have coercive sex.

Dr. Abrams opined that Consiglio currently does suffer from ASPD to some degree, but not to the extent that he qualifies as an SVP because the mental disorder does not predispose him or impair his volitional capacity to a significant degree. Dr. Abrams concluded that Consiglio's age, his health problems, his anxiety about dying in prison, his current relationship, and the fact that he had not committed any sexually deviant behavior in 20 years, weigh on the side of a low risk of reoffending if he were released into the community.

*Dr. Abbott*

Brian Abbott, Ph.D., a psychologist, examined Consiglio in September 2012 and spoke with him about his current relationship. Consiglio said he and his fiancé had a

19

positive relationship, although he felt frustrated that he could not perform sexually with her, and he enjoyed helping her out and providing food that she would take to Mexico to give to needy people.

Dr. Abbott opined that Consiglio's behavior with Nancy L. did not involve any overt sexual behavior and that Consiglio intended to help her. Consiglio described his role with Nancy L. as trying to help her apply for a gym membership.

Dr. Abbott testified that, "when you're dealing with the issue of serious difficulty in controlling sexually violent behavior, the DSM does not address that particular element of the diagnosed mental disorder." He indicated that the DSM-IV-TR does not mention the subject of serious difficulty in controlling one's behavior. Among other things, Dr. Abbott looks at recent objective indicia of a serious difficulty in controlling sexually violent behavior. Specifically, assuming the client has "some type of acquired congenital condition" that would affect the client's emotional or volitional capacity, Dr. Abbott looks for the client's "verbalizing difficulty controlling the sexual urges or demonstrating actual behavior in custody that reflected serious difficulty controlling sexually violent behavior."

Dr. Abbott diagnosed Consiglio with exhibiting antisocial traits and narcissistic personality traits, but not a personality disorder.

Dr. Abbott testified that paraphilia NOS is a diagnostic category in the DSM-IV-TR under which a clinician can list a paraphilia that is not one of the eight categories of paraphilia listed in that manual.

20

He also testified that paraphilia NOS nonconsent, which he also referred to as paraphilic coercive disorder, is a disorder in which a person has a preference for engaging in forcible or nonconsensual sexual behavior. The nonconsensual nature of the sexual act is the stimulus for the orgasm. The sexual arousal is "predicated on engaging in forcible or nonconsen[sual] sexual behavior or fantasizing about it." Dr. Abbott indicated there is some debate in the literature about whether this disorder is overdiagnosed in SVP proceedings. He stated there is a tendency to substantiate this diagnosis "based on the number of sexual assaults over time" as the main diagnostic criterion, but the number of sexual assaults "[has] been shown to be an unreliable indicator of the condition." Dr. Abbott added that both the chairperson and the editor of the DSM-IV-TR have written articles "expressing concerns over the overuse of the [paraphilic coercive disorder] diagnosis or the misuse of it in [SVP] commitment trials."

Dr. Abbott also testified that, in determining whether a person has a sexual preference for nonconsensual sex and should be diagnosed with paraphilic coercive disorder, one must understand what the person is thinking. One would look at whether the person possesses pornography that reflects paraphilic preference, whether the person's sexual arousal is inhibited by consensual sexual behaviors, and whether the person engages in "scripted" behavior that is the result of "persistent rehearsal of the rape" in that person's mind. That rehearsal in the mind has been associated with what Dr. Abbott called a "nonparaphilic power rapist"─a rapist "who uses the rape as a form of sexualized assertion of power and control."

Dr. Abbott opined that Consiglio suffered from antisocial personality disorder with narcissistic features until about 1998 and since then his personality disorder behaviors have lessened in terms of frequency, intensity, and severity. Currently, "there is not a sufficient clinical basis to substantiate the full threshold for personality disorder."

Among the features of antisocial personality disorder that Consiglio currently displays are denial related to his sexually offending behavior and his lack of remorse towards his victims. Dr. Abbott opined this alone does not suffice for purposes of an SVP commitment.

In determining whether Consiglio is a paraphilic rapist, Dr. Abbott looked at his prior offenses to see whether he was showing some type of preference for forcible or nonconsensual sexual behaviors. Dr. Abbott opined that some of Consiglio's prior offenses were inconsistent with a diagnosis of paraphilic coercive disorder because Consiglio discontinued the sexual assault or did not rape the victim. In order to be a paraphilic rapist, the person must complete a sexual act, but does not have to come to climax.

Dr. Abbott opined that the incidents involving Consiglio and a prostitute in Las Vegas and a prostitute in Florida were more consistent with antisocial personality disorder and the use of some perceived advantage in order to have sex than with paraphilic coercive disorder. He also opined that the circumstances involving Nancy L. do not indicate behavior suggesting Consiglio has a mental disorder predisposing him to engage in sexually violent predatory behavior.

22

Dr. Abbott opined that Consiglio's risk of reoffending in a sexually violent predatory manner if released is not high, and he does not meet the "likely to reoffend" legal standard to qualify as an SVP.

B. *Procedural Background*

1. *SVP petition*

In early February 2012, while Consiglio was in custody for a parole violation, the San Diego County District Attorney filed a petition under section 6600 alleging that Consiglio is a sexually violent predator and requesting that the court commit him for an indeterminate term to the California Department of Mental Health (now DSH). Specifically, the petition alleged Consiglio is an SVP in that he was convicted of a sexually violent offense against one or more victims, and he has a diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely he will engage in sexually violent predatory criminal behavior. The petition also alleged that Consiglio had been convicted of criminal sexual conduct in Michigan in 1979 and sentenced to a prison term of seven and a half to 15 years (victim: Jacqueline M.); that he was convicted in California in 1991 of rape by force and, following reversal on appeal and retrial, was convicted of rape by force in 1994 and sentenced to nine years in prison (victim: Karen G.); and that he was convicted in California in 1992 of rape by force, rape by threat, sodomy by force, oral copulation under color of authority and forcible oral copulation, and was sentenced to 24 years in prison (victim: Carolyn P.). The petition further alleged Consiglio was released on parole in February 2009, he violated his parole,

23

and he currently was in the custody of the California Department of Corrections and Rehabilitation.

2. *Consiglio's unsuccessful pretrial motion to dismiss the SVP proceedings*

In April 2012 Consiglio filed a pretrial motion to dismiss the SVP proceedings, claiming the decision of the BPH revoking his parole─which was the basis of his custody at the time the SVP proceedings were initiated─was later rescinded, and, thus, he could not be subject to SVP proceedings because his custody at the time the SVP petition was filed was "invalid." The prosecution opposed the motion, citing section 6601, subdivision (a)(2) (hereafter § 6601(a)(2)) and *In re Smith* (2008) 42 Cal.4th 1251. The court denied Consiglio's motion to dismiss the SVP proceedings.

3. *Trial and commitment order*

In November 2012 Consiglio waived his right to a jury trial and agreed the allegations in the petition could be decided by the trial court. Following the bench trial, the court found Consiglio is an SVP and ordered him committed to DSH for an indeterminate term. Consiglio's appeal challenging the commitment order followed.

DISCUSSION

I. *SUFFICIENCY OF THE EVIDENCE*

Consiglio first contends the evidence is insufficient to support the court's finding that he is an SVP likely to reoffend if he were released. This contention is unavailing.

A. *Applicable Legal Principles*

1. *The SVPA*

The SVPA, which is set forth in section 6600 et seq., "provides for the involuntary civil commitment"─for an indeterminate term in the custody of DSH─"of those persons identified as SVP's before they have completed their prison or parole revocation terms." (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 515-516 (*Poulsom*); see § 6604.)  In *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 (*Hubbart*), the California Supreme Court explained that, in describing the underlying purpose of the SVPA, "the Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes.  The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison.  The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public.  No punitive purpose was intended." (*Id*. at pp. 1143-1144.)

"The requirements for classification as [an SVP] are set forth in section 6600, subdivision (a) and related provisions." (*Hubbart*, *supra*, 19 Cal.4th at p. 1144.)  "To prove that a defendant is an SVP, the People must establish [the following three criteria set forth in section 6600, subdivision (a)(1)]:  (1) he has been convicted of a '[s]exually

25

violent offense[4] against one or more victims'; (2) he has a 'diagnosed mental disorder';[5] and (3) the mental disorder makes it 'likely' that, if released, he will engage in 'sexually violent criminal behavior.'" (*Poulsom, supra*, 213 Cal.App.4th at p. 516.)

"The trier of fact is charged with determining whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt.'" (*Hubbart, supra*, 19 Cal.4th at p. 1147, citing § 6604.)

2. *Standard of review*

"In reviewing the sufficiency of the evidence to support a person's civil commitment as an SVP, we apply the substantial evidence standard of review." (*Poulsom, supra*, 213 Cal.App.4th at p. 518, citing *People v. Mercer* (1999) 70 Cal.App.4th 463, 465-466 (*Mercer*); see also *People v. McCloud, supra*, 213 Cal.App.4th at p. 1088.)

Under this standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319;

---

4    "The SVPA defines the term 'sexually violent offense' to mean certain enumerated sex crimes committed by 'force, violence, duress, menace, [or] fear of immediate and unlawful bodily injury on the victim or another person.' (§ 6600, subd. (b).)"

5    "The term 'diagnosed mental disorder,' as defined by the Act, means 'a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' (§ 6600, subd. (c).)"

26

*Poulsom, supra*, 213 Cal.App.4th at p. 518.) "The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on '"isolated bits of evidence."'" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261, original italics omitted.)

In *Poulsom* this court recently explained that, in applying the substantial evidence standard of review, "[w]e 'must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.] Further, '[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and *not substitute our evaluation of a witness's credibility for that of the fact finder*.' [Citation.] This is true even in the context of expert witness testimony." (*Poulsom, supra*, 213 Cal.App.4th at p. 518, italics added.) "'The credibility of the experts and their conclusions [are] matters [to be] resolved . . . by the [trier of fact],' and '[w]e are not free to reweigh or reinterpret [that] evidence.'" (*Ibid*., quoting *Mercer, supra,* 70 Cal.App.4th at pp. 466-467.) In sum, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314; *Poulsom, supra*, 213 Cal.App.4th at p. 518.)

To prevail on a sufficiency of the evidence claim, the defendant must present his case to us in a manner consistent with the rules governing application of the substantial evidence standard of review. That is, the defendant must set forth in his opening brief all of the material evidence on the disputed legal elements at issue in the case in the light most favorable to the People and then must persuade us that evidence cannot reasonably support the jury's verdict. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) "If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [trier of fact's] verdict may lie in the evidence he ignores." (*Ibid*.)

B. *Analysis*

We conclude Consiglio has failed to meet his burden of showing the evidence is insufficient to support the court's finding that he is an SVP because, contrary to the foregoing rules governing application of the substantial evidence standard of review, (1) he essentially asks this court to reevaluate the credibility of the prosecution's expert witnesses, reweigh the evidence, and resolve conflicts in the evidence; and (2) in arguing his claim, he has failed to present us with all the relevant evidence, and he has failed to present the evidence in the light most favorable to the People.

That Consiglio is asking this court to reevaluate the credibility of the prosecution's expert witnesses─Dr. Arnold and Dr. Damon─and reweigh the expert testimony the parties presented, is shown by his assertions that (1) the defense experts─Dr. Abrams and Dr. Abbott─"trumped [the] prosecution experts" by "establishing that the ersatz

28

paraphilia, with which he was diagnosed" by the prosecution experts—paraphilic coercive disorder[6]—is not a valid diagnosis, "as defense experts contended"; and (2) the testimony of the prosecution experts that he suffers from paraphilia NOS was "speculative and inherently insubstantial." In essence, Consiglio is claiming his defense experts were more credible that the prosecution experts. This is also shown by Consiglio's argument that, contrary to testimony provided by the prosecution experts, one of his experts—Dr. Abrams—"opined—from a standpoint of *superior* medical and legal and mental health credentials—that [he, Consiglio,] could not be inferred to be aroused from nonconsent." (Italics added.)

That Consiglio is asking this court to reweigh the evidence and resolve evidentiary conflicts is shown by his argument regarding the testimony of one of the prosecution experts, Dr. Arnold, concerning the basis for his opinion that Consiglio has a deviant sexual attraction to nonconsensual situations and urges to sexually assault women. Dr. Arnold testified that, during an arrest in 1972, Consiglio asserted, "I don't have those urges any more." Dr. Arnold opined that Consiglio's statement was an acknowledgement that he had had such urges. Dr. Arnold then testified that Consiglio "reoffend[ed] the next year and years after that." In his appellant's opening brief, Consiglio essentially asks this court to reweigh Dr. Arnold's testimony, stating: "[T]hat begs the question, 'What urges?' Presumably all rapists have urges to rape, and the prosecution experts did not dispute that [he] had not admitted any 'urges' since 1972."

---

6    Consiglio refers to paraphilic coercive disorder as "rape paraphilia" and "paraphilia coercive disorder."

29

In presenting his insufficiency-of-the-evidence claim, Consiglio also has failed to present us with all the relevant evidence and to present the evidence in the light most favorable to the SVP commitment order he is challenging. For example, in support of his principal contention that rape paraphilia (paraphilic coercive disorder) is not a valid diagnosis "as [his] defense experts contended," Consiglio asserts that "a diagnosis implies a reliable set of criteria," but "[t]here are none for rape paraphilia, in the DSM or elsewhere."

However, in presenting this contention, Consiglio fails to acknowledge or discuss substantial evidence which, viewed in the light most favorable to the SVP commitment order, supports the court's finding that paraphilic coercive disorder is a recognized mental disorder even though it is not specifically listed in the DSM-IV-TR. One of the prosecution experts, Dr. Arnold, acknowledged that when the DSM-III was revised, it did not list paraphilic coercive disorder as a separate disorder. Consiglio fails to present the portion of Dr. Arnold's testimony in which he explained that paraphilic coercive disorder was not listed because victim groups feared that perpetrators of sexual crimes could use it as a means to avoid responsibility. Consiglio also fails to present Dr. Arnold's testimony that the revised DSM "described what would have been diagnosed as paraphilic coercive disorder with the instruction that if you encounter a person like this, then the proper way to diagnose it is as paraphilia [NOS] because it is not included as [its] own category within the DSM." This testimony explains why Dr. Arnold formally diagnosed Consiglio with paraphilia NOS and not with paraphilic coercive disorder. Dr. Arnold testified: "*From the DSM nomenclature* I found [Consiglio] to meet two diagnos[e]s. One is

30

*paraphilia* [*NOS*]." (Italics added.) Viewed in the light most favorable to the SVP commitment order at issue here, the foregoing substantial evidence shows Dr. Arnold followed the "instruction" that the listed DSM category of paraphilia NOS should be used as the appropriate diagnosis for someone like Consiglio.

Consiglio also disregards Dr. Arnold's testimony that Consiglio's dream about showing up at his female therapist's home with a gun, which Consiglio described as the "best dream" he ever had, was "remarkable" in that it showed Consiglio "had the same type of fantasy that's even described as [a] case study within the [DSM]."

Consiglio also disregards a significant portion of the testimony of one of his own experts, Dr. Abbott. Specifically, he disregards Dr. Abbott's testimony that paraphilia NOS is a diagnostic category in the DSM-IV-TR under which a clinician can list a paraphilia that is *not* one of the eight categories of paraphilia listed in that manual and that "[p]araphilia NOS nonconsent," which he also referred to as paraphilic coercive disorder, "is a disorder where a person has a sexual preference for engaging in forcible or nonconsensual sexual behavior." Contrary to Consiglio's claim that rape paraphilia (paraphilic coercive disorder) is not a valid diagnosis, as his defense experts contended at trial, the foregoing expert testimony by Dr. Abbott shows that paraphilic coercive disorder is a recognized mental disorder. Dr. Abbott also indicated in his testimony that there is some debate in the literature of the professional community whether paraphilic coercive disorder (also referred to as paraphilic NOS nonconsent) is overdiagnosed in SVP proceedings.

31

In light of Consiglio's numerous and pervasive violations of the fundamental rules governing application of the substantial evidence standard of review, we conclude he has failed to meet his burden of showing the evidence is insufficient to support the court's finding that he is an SVP. We also conclude substantial trial evidence presented by the prosecution—as summarized, *ante*, in the factual background—amply supports the court's determination.

In light of our conclusions, we need not discuss in detail the recent decision in *People v. McCloud*, *supra*, 213 Cal.App.4th 1076—which Consiglio attempts to distinguish—affirming an order civilly committing the defendant in that case as an SVP. It is sufficient to note the *McCloud* court concluded that the opinions of the prosecution experts that the defendant currently suffered from paraphilia NOS "were not based solely on [the defendant's] prior convictions," and substantial evidence supported the jury's finding that the defendant was an SVP. (*Id*. at pp. 1089-1090.) Similarly here, the opinions of the prosecution experts that Consiglio suffers from paraphilia NOS and qualifies as an SVP were not based solely on his history of committing sexual offenses; and, as we have concluded, substantial evidence supports the court's finding he is an SVP.

II. *DENIAL OF CONSIGLIO'S MOTION TO DISMISS THE SVP PROCEEDINGS*

Next, Consiglio contends the court erred by denying his pretrial motion to dismiss the SVP proceedings. We reject this contention.

A. *Background*

1. *Consiglio's April 2011 arrest and his one-year parole revocation custody*

Consiglio was released on parole in February 2009, but was arrested on April 17, 2011, and charged with multiple violations of the terms of his parole. In June 2011, following the parole revocation hearing, the BPH sustained one of the charges and revoked Consiglio's parole. Consiglio was returned to custody for a period of one year.

In late February 2012, an administrative review of the BPH's decision resulted in a determination that, although there was a written record of the parole revocation hearing, the tape that purportedly recorded that hearing was blank. As a tape recording of that hearing was required by law, the associate chief deputy commissioner (ACDC) who conducted the review "rescinded" the "BPH action" at Consiglio's parole revocation hearing even though there was a written record of that hearing and ordered that a new parole revocation hearing be conducted on the parole violation charge that the BPH had sustained. He also ordered that "[t]he parolee [(Consiglio)] shall remain in custody pending the new hearing."

It is undisputed the BPH did not hold a new parole revocation hearing in this matter, and, thus, the rescinded parole revocation was not reinstated.

3. *Consiglio's pretrial motion to dismiss the SVP proceedings*

On April 25, 2012, after the one-year period of custody ordered by the BPH ended on April 16, 2012, Consiglio filed a pretrial motion to dismiss the SVP proceedings, claiming (1) the BPH's parole revocation decision—which was the basis of his custody at the time the SVP proceedings were initiated in early February 2012—had been rescinded

33

later that month because the tape of the parole revocation hearing was blank; (2) a new parole revocation hearing had not been held; and (3) thus, he could not be subject to SVP proceedings because his custody at the time the SVP petition was filed was "invalid."

The prosecution opposed the motion, citing section 6601(a)(2) and *In re Smith*, *supra*, 42 Cal.4th 1251, in support of its argument that, since Consiglio was initially committed to prison as a result of valid convictions, the SVP proceedings were properly initiated against him while he was recommitted on a parole revocation, whether that revocation was valid or invalid.

a. *Ruling*

After hearing arguments, the court denied Consiglio's motion to dismiss the SVP proceedings. In support of its ruling, the court cited section 6601(a)(2) and *In re Smith* and found that Consiglio's custody at the time of filing of the petition was based on the revocation of his parole, and, although the parole revocation was later rescinded, it was rescinded because the BPH had made a good faith mistake within the meaning of section 6601(a)(2) when it failed to properly record the parole revocation hearing.

B. *Analysis*

Citing *In re Smith*, *supra*, 42 Cal.4th 1251, Consiglio claims the court erred in denying his motion to dismiss the SVP proceedings, and, thus, the order committing him as an SVP should be reversed. Specifically, he claims the denial of his motion to dismiss was erroneous because, although he was in custody at the time the SVP petition was filed (on February 3, 2012) as required by section 6601(a)(2) of the SVPA, he was not in lawful custody at that time because (1) later that month the ACDC rescinded the BPH's

34

decision to revoke his parole because a legally required tape recording of the parole revocation hearing did not exist as the tape was found to be blank; and (2) although the ACDC ordered that a new parole revocation hearing be conducted, that hearing was never scheduled. In support of this claim, Consiglio asserts "[h]e should be treated as one *out of custody*, with no parole revocation reinstituted after rescission" (italics added), and "[t]he court's finding of a good faith mistake was not supportable on the appellate record." Consiglio's claim is unavailing.

Quoting section 6601(a)(2), the California Supreme Court has explained that "[a] petition to commit a person as an SVP may be filed only 'if the individual was *in custody* pursuant to his or her determinate prison term, *parole revocation term*, or a hold placed pursuant to Section 6601.3, at the time the petition is filed.'" (*In re Lucas* (2012) 53 Cal.4th 839, 843, italics added.)

However, section 6601(a)(2) also provides that an SVP petition "shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a *good faith mistake of fact or law*." (Italics added.)

In *People v. Wakefield* (2000) 81 Cal.App.4th 893, 897-898, this court explained that, in enacting section 6601(a)(2), the Legislature "made it absolutely clear" that "lawful custody has never been a jurisdictional prerequisite to filing an SVP petition; a later judicial or administrative proceeding determination the custody was unlawful does not deprive the court of the power to proceed on an SVP petition if the custody status when the petition was filed was a result of a good faith mistake of law or fact."

35

Thus, under the plain language of section 6601(a)(2), the trial court in this case was statutorily required to deny Consiglio's motion to dismiss the SVP proceedings if the motion was based on "a later . . . administrative determination" that Consiglio's custody at the time the SVP petition was filed was "unlawful," and the "unlawful custody" was the result of a "good faith mistake of fact or law."  (§ 6601(a)(2).)

For purposes of section 6601(a)(2), the record in this case shows that Consiglio's motion to dismiss the SVP proceedings was based on an administrative determination that his custody at the time the SVP petition was filed was unlawful and that his unlawful custody was the result of a good faith mistake of fact or law.  Specifically, the record shows that, as a result of the BPH's revocation of his parole, Consiglio was in custody at the time the SVP was filed in early February 2012.  It also establishes the ACDC's later administrative decision that the BPH's revocation of Consiglio's parole must be rescinded on the ground the parole revocation hearing had not been properly recorded, was tantamount to a determination that Consiglio's custody at the time the petition was filed was unlawful within the meaning of section 6601(a)(2).  Specifically, the ACDC found that, although there was a written record of the parole revocation hearing, a tape recording of that hearing was required by law, but the tape in question was found to be blank, thereby requiring that the parole revocation which resulted in Consiglio's custody be rescinded.

The foregoing record also supports the court's factual finding that the revocation of his parole was rescinded because the BPH had made a good faith mistake within the

36

meaning of section 6601(a)(2) when it failed to properly record the parole revocation hearing.

Thus, we conclude the court was statutorily required under section 6601(a)(2) to deny Consiglio's motion to dismiss the SVP proceedings.

Consiglio's reliance on *In re Smith*, *supra*, 42 Cal.4th 1251, is unavailing. In that case, the California Supreme Court explained that section 6601(a)(2) "allow[s] the state to proceed [on an SVP petition] against those whose initial prison custody was valid, but who might evade SVP commitment due to erroneous parole revocations." (*In re Smith*, at p. 1269.) Here, Consiglio does not challenge the validity of his underlying convictions and initial prison custody. Although he seeks to evade SVP commitment due to an erroneous parole revocation that was rescinded after the SVP petition was filed, his attempt to do so is unavailing for the reasons discussed, *ante*. Accordingly, we affirm the court's order denying Consiglio's motion to dismiss the SVP proceedings.

III. *DUE PROCESS, DOUBLE JEOPARDY, AND EX POST FACTO CLAIMS*

Consiglio also claims the SVPA violates his federal and state constitutional rights to due process of law, violates double jeopardy prohibitions, and constitutes a punitive ex post facto law. Citing *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), however, he acknowledges these constitutional challenges have been rejected by our Supreme Court and asserts that he "wish[es] to preserve these issues, should the California Supreme Court or the United States Supreme Court later change its mind, so he could later seek review."

We are bound to follow Supreme Court precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Thus, we must follow *McKee I*.  Accordingly, we reject Consiglio's due process, double jeopardy, and ex post facto claims.

## IV.  *EQUAL PROTECTION CLAIM*

Last, Consiglio contends his indeterminate commitment under the SVPA must be reversed because it violates his constitutional right to equal protection under the law, and his case must be remanded for a hearing to determine whether the SVPA as applied to him violated this fundamental right.  Specifically, like the defendant in *McKee I*, *supra*, 47 Cal.4th 1172, Consiglio contends his involuntary civil commitment under the SVPA violates equal protection principles because he is subject to a greater burden to obtain release than mentally disordered offenders (MDO's) civilly committed under the Mentally Disordered Offenders Act (Pen. Code, § 2960 et seq.) or persons being found not guilty by reason of insanity (NGI's) and civilly committed under the statutory NGI commitment scheme (Pen. Code, § 1026 et seq.).  (See *McKee I*, at pp. 1196-1197, 1200-1202, 1207.)

The California Supreme Court did not decide this issue in *McKee I*.  Instead, it remanded the matter to this court with directions to remand it back to the trial court for an evidentiary hearing to determine whether the People could demonstrate a "constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment."  (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1209, 1211, fn. omitted.)  The *McKee I* court stated that the People would have an

38

opportunity to make an "appropriate showing on remand" that, "notwithstanding the similarities between SVP's and [other civilly committed persons, such as] MDO's, the former *as a class* bear a substantially greater risk to society and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I*, at p. 1208, italics added.) The Supreme Court suggested a variety of ways the People might make such a showing, including the presentation of evidence that SVP's "as a class" pose a greater risk of recidivism because of the "inherent nature of the SVP's mental disorder" or that "SVP's pose a greater risk to a particularly vulnerable class of victims." (*Ibid.*)

On remand, the trial court conducted a 21-day evidentiary hearing and determined the People met their burden of demonstrating a constitutional justification for the disparate treatment of SVP's under the standards set forth in *McKee I*. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1330 (*McKee II*).) Accordingly, the court confirmed its order committing the defendant under the SVPA to the custody of the California Department of Mental Health for an indeterminate term. (*McKee II*, at p. 1332.)

In *McKee II* we independently reviewed the trial court's decision and affirmed the commitment order. (*McKee II*, supra, 207 Cal.App.4th at pp. 1338, 1350.) We concluded that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released)." (*McKee II*, at p. 1347.) We also concluded that "the disparate treatment of SVP's under the Act is reasonable and factually

39

based and was adequately justified by the People at the evidentiary hearing on remand" and that the SVPA "[did] not violate McKee's constitutional equal protection rights." (*McKee II*, at p. 1348.)

In support of our conclusions in *McKee II*, we stated that the People had shown that (1) notwithstanding their similarities with MDO's and NGI's, SVP's "as a class" bear a substantially greater risk to society and, thus, imposing on them a greater burden before they can be released from commitment is needed to protect society; (2) SVP's "as a class" are significantly more likely to recidivate due to the inherent nature of the SVP's mental disorder; (3) SVP's pose a greater risk and unique dangers to particularly vulnerable victims, such as children; and (4) the diagnoses and treatment needs of SVP's differ from MDO's and NGI's, " thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the amended Act is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

Consiglio does not present any new arguments giving us reason to question our decision in *McKee II*, *supra*, 207 Cal.App.4th 1325. Our conclusions and reasoning in *McKee II* apply to this case as well. Following *McKee II*, we conclude the SVPA does not violate Consiglio's constitutional equal protection rights. Accordingly, we deny his request for remand and affirm the order committing him to the custody of DSH.

DISPOSITION

The order of the trial court committing Consiglio to the custody of DSH is affirmed.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.

41